UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO.5:19-CR-261-FL

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMAL MONTA WATSON | SENTENCING<br>MEMORANDUM |

Now Comes, Jamal Monta Watson, the defendant, by and through undersigned counsel, and respectfully submits this sentencing memorandum in support of his request for a reasonable sentence. Foundational to our justice system is the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citing *Williams v. New York*, 337 U.S. 241, 247 (1949)). As such, sentencing courts must ultimately consider the purposes set forth in 18 U.S.C. § 3553(a) in fashioning a sentence "sufficient, but not greater than necessary" that secures these broader goals. *See generally* 18 U.S.C. § 3553(a).

I.

Mr. Watson seeks a variance for a below the guidelines sentence followed by a 2-year term of supervised release. Mr. Watson also requests that the Court recommend home confinement when Mr. Watson is within 12 months of his projected release date.

II.

Mr. Watson seeks a variance for a below the guidelines sentence.[1] Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. In undertaking this analysis, the Court considers sentencing factors, such as:

> (1) the nature of the offense and history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the

---

[1] At sentencing, the Court must first calculate the advisory guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007).

need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to victims.

18 U.S.C. § 3553(a).

In Mr. Watson's case, twelve levels were added for the amount of loss in this case without basis in empirical data and without any demonstrated need to further any purpose of sentencing. The enhancement fails to reduce the unwarranted emphasis on both actual and intended loss that, alone and especially in combination, tend to overstate the seriousness of his offense.

Indeed —

> The [g]uidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.[2]

Widespread disagreement with the fraud guidelines is further evidence that it is unsound. The primary criticism has been that fraud defendants were eligible for extremely draconian-length guideline sentences. Since the fraud and theft guidelines were consolidated in 2001, the fraud guidelines have collected sustained comment and critique.[3] Moreover, under the many enhancements adopted by the Sentencing Commission, fairly typical high-loss fraud cases often produce guidelines ranges that extend well beyond the maximum penalties.[4] The nearly continuous harshening of fraud sentencing guidelines has generated significant pushback, evident in numerous court opinions. Courts have referred to the fraud

---

[2] *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). *See also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the sentencing guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]").

[3] *See* Frank O. Bowman, III, Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now), 27 FED. SENT'G REP. 270, 271 (2015); *see also* Jeffrey S. Parker & Michael K. Block, *The Limits of Federal Criminal Sentencing Policy; Or, Confessions of Two Reformed Reformers*, 9 GEO. MASON L. REV. 1001, 1053 (2001).

[4] *See, e.g.*, *United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (noting that the guidelines called for a life sentence with a total offense level of 43 and a criminal history of I, but were limited by a statutory maximum of a five-year sentence).

guidelines as "patently unreasonable" and "so run amok that they are patently absurd on their face;[5] "of no help;[6] and both "fundamentally flawed" and "valueless.[7] This resistance to the fraud guidelines has manifested likely because, along with a wide range of critics, courts lack sufficient confidence in the policies underlying it and the sentencing ranges it produces.[8] To be consistent with the proper principles of punishment, Mr. Watson asks this Court to consider scrapping the twelve level enhancement and vary below the guidelines.

With this latest incarceration period of at least 507 days, Mr. Watson has thought about many aspects of his prison time —including material deprivations; restricted movement and liberty; a lack of meaningful activity; a nearly total absence of personal privacy and high levels of interpersonal uncertainty; time away from his family; and, most importantly, his health. His previous terms of incarceration, his period of supervision, and this subsequent period of incarceration have had, without doubt, a profound impact on his desire to change and improve his life.

Mr. Watson's history seems to line up with another lengthy prison sentence.

However, even still, a variance below the bottom of the guidelines for his offense is substantively reasonable and this Court's decision would reflect a thorough, individualized assessment of Mr. Watson's circumstances, arguments in mitigation, and the statutory sentencing factors. 18 U.S.C § 3553(a).

Mr. Watson's health and need for medical care justifies a variance below the bottom of the guidelines sentence. Mr. Watson suffers from asthma —a chronic disease that affects the airways in the lungs. PSR at ¶ 53. This condition, in combination with the possibility of contracting COVID-19 —a novel coronavirus —warrants a variance below the bottom of the guidelines sentence. Mr. Watson is a 42-year-old African-American male,[9] and thus susceptible to severe illness and death from COVID-19. The

---

[5] *United States v. Adelson*, 441 F. Supp. 2d at 515.
[6] *United States v. Watt*, 707 F. Supp. 2d at 151.
[7] *United States v. Corsey*, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).
[8] Michael Caruso, Fed. Pub. Def., S. Dist. Fla., Statement Before the United States Sentencing Commission Public Hearing on Economic Crime and Inflationary Adjustments 1 (Mar. 12, 2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Caruso.pdf.
[9] In North Carolina, African Americans make up 22 percent of the population, yet 24% of COVID-19 cases and 32% of COVID-19 deaths. Individuals aged 25-49 years old make up 44% of the COVID-19 cases in North Carolina. *See* North Carolina Department of Health and Human Services, Data and

CDC has reported that, "[p]eople with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease".[10] People of any age who suffer from moderate to severe asthma have an elevated risk.[11] In serious cases, COVID-19 causes acute respiratory disease syndrome —ARDS —which is life-threatening; even those who receive ideal medical care with ARDS have a 30% mortality rate.[12] Mr. Watson is at a risk of infection simply because COVID-19 is highly contagious and detention facilities are associated with high transmission of infectious disease —including tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.[13] Mr. Watson is housed at the Federal Correctional Complex in Butner, North Carolina, a known epicenter for COVID-19. In fact, as of July 29, 2020, Granville and Vance County, the communities from which FCI Butner presumably draws it staff, has reported 1,822 COVID-19 cases with 504 of the positive test results in Granville County being reported at the Federal Correctional Complex in Butner, North Carolina.[14] There are six outbreaks at congregate living facilities in Granville County —one of which is the Federal Correctional Complex in Butner.[15] There have been a total of 25 deaths in the Granville County health district: 21 with the Bureau of Prisons.[16]

Mr. Watson is likely further susceptible to COVID-19 because of his underlying condition. There are limited treatments, and no known vaccine or cure for COVID-19. Conditions of confinement create the ideal environment for the transmission of contagious disease.[17] Prisons, jails, and detention centers are

---

Demographics, https://covid19.ncdhhs.gov/dashboard/about-data (last visited January 30, 2020).
[10] Centers for Disease Control and Prevention, People with Asthma, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html.
[11] Coronavirus disease (COVID-19) advice for the public: Myth busters, World Health Organization, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").
[12] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk
[13] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047 (Oct. 2007), https://doi.org/10.1086/521910.
[14] Novel Coronavirus Disease 2019 (COVID-19) Information for Granville & Vance County, https://gvph.org/covid-19/ (last visited July 30, 2020).
[15] *Id.*
[16] *Id.*
[17] *Bick*, *supra* note 13.

especially vulnerable to outbreaks of COVID-19.[18]   As an inmate, Mr. Watson could not be in a worse position to follow the CDC's advice for protecting himself from COVID-19.[19]   The inherent nature of detention facilities render standard precautions such as social distancing and surface decontamination virtually impossible.   Once COVID-19 is introduced into a facility, the nature of these facilities makes it difficult to implement mitigation measures.[20, 21]   Across the Bureau of Prisons, 3,566 inmates and 483 staff members have confirmed positive cases of COVID-19; there have been one hundred, four deaths.[22]   Courts have recognized "the health risks —to inmates, guards, and the community at large —created by large prison populations."   *United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (collecting cases); *see also Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) (holding that "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions.").

   Further, under the guidelines, age is typically not relevant; but, may be so in unusual cases or in combination with other factors.   Recidivism rates decline relatively consistently as age increases.   *See* Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*,* U.S. Sentencing Commission (May 2004) at 12, 28.[23]   Mr. Watson will be well into his forties at the time of his projected release date with a variance below the bottom of the guidelines sentence.

---

[18] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), https://bit.ly/2TNcNZY.
[19] How to Protect Yourself and Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (detailing good protocol includes washing hands, avoiding close contact with others, and wearing a cloth face covering).
[20] *See Coreas v. Bound*, 2020 WL 1663133 (D. Md. April 3, 2020) (discussing COVID-19 and its effects on the jail and prison populations).
[21] *United States v. Davis*, 2020 WL 1529158 (D. Md. Mar. 30, 2020) ("Experts agree that pretrial detention facilities are poorly equipped to manage a crisis resulting from this potentially deadly, highly contagious novel coronavirus within their walls.").
[22] COVID-19 Cases, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 30, 2020). The Bureau of Prisons also notes that 6,856 inmates and 683 staff members have recovered from COVID-19.
[23] www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf; *See also* National Research Council. The Growth of Incarceration in the United States: Exploring Causes and Consequences 4 (Jeremy Travis et al. eds., 2014) (finding that because offending declines markedly with age, the incapacitation effect of very long sentences is likely to be small), https://www.nap.edu/read/18613/ (last visited July 30, 2020).

III.

Mr. Watson also seeks a 2-year term of supervised release. Supervised release "is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Rather, it "is a unique method of post-confinement supervision," *Gozlon–Peretz v. United States*, 498 U.S. 395 (1991), "providing for a term of [supervision] . . . after incarceration to improve the odds of a successful transition from the prison to liberty." *Johnson v. United States*, 529 U.S. 694, 708–09 (2000).

IV.

Mr. Watson requests that the Court recommend home confinement when he is within 12 months of his projected release date. Mr. Watson would typically not be eligible for home confinement based solely on the duration of a below the guidelines sentence. However, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, 516, § 12003(b)(2) (enacted Mar. 27, 2020), permits the director of the Bureau of Prisons to lengthen the maximum amount of time that a prisoner may be placed on home confinement, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP.[24] While this provision does not authorize the Court to order Mr. Watson's placement on home confinement, —he must seek home confinement through the Bureau of Prisons' administrative process— the BOP does take seriously recommendations from the Court. Further, 18 U.S.C. § 3621(b) gives the Bureau of Prisons a list of factors to consider when determining where to house an incarcerated person —including their security designation and their mental and medical needs. In particular, the BOP is directed to consider "any statement by the [C]ourt that imposed the sentence—

> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or (B) recommending a type of penal or correctional facility as appropriate[.]"

18 U.S.C. § 3621(b)(4).

That being said, the Bureau of Prisons routinely relies on judicial recommendations that express how an individual should serve his time and the Court may make a recommendation that the BOP place Mr. Watson on home confinement. *See* 18 U.S.C. § 3621(b); *United States v. Doshi*, No. 13-CR-20349,

---

[24] The Bureau of Prisons has placed 7,187 individuals on home confinement. See, supra note. 22.

2020 WL 1527186, at *2 (E.D. Mich. Mar. 31, 2020) (granting defendant's motion for judicial recommendation for home confinement); *United States v. Knox*, No. 15 Cr. 445 (PAE), 2020 WL 1487272, at *2 (S.D.N.Y. Mar. 27, 2020) (same). *See also United States v. Campbell*, No. CR03-4020-LTS, 2020 WL 3491569 (N.D. Iowa June 26, 2020).

With participation in vocational training, education coursework, faith-based programs, mental health treatment, and drug rehabilitation,[25] Mr. Watson would be an appropriate candidate to seek home confinement and asks the Court to recommend home confinement within 12 months of his projected release date.

V.

WHEREFORE, Mr. Watson respectfully requests that the Court craft a sentence that is "sufficient, but not greater than necessary" after consideration of 18 U.S.C. § 3553(a). *See also Gall*, 552 U.S. at 50 (framework to make an individualized assessment based on the facts presented).

Accordingly, Mr. Watson respectfully requests that this Court vary and impose a sentence below the guidelines range followed by a 2-year term of supervised release and recommend home confinement within 12 months of Mr. Watson's projected release date. This sentence would adequately account for the sentencing goals of 18 U.S.C. § 3553(a), while still providing adequate punishment to Mr. Watson.

---

[25] The First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), promotes programs to prepare individuals for a productive life outside prison. The legislation incentivizes nonviolent and low-risk individuals to participate in evidence-based recidivism reduction programs and earn time credits toward prerelease custody.

Respectfully submitted this 30th day of July, 2020.

                                            G. ALAN DUBOIS
                                            Federal Public Defender

***/s/ Cindy Johnson***
CINDY JOHNSON
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Cindy_Johnson@fd.org
N.C. State Bar No. 41788
LR 57.1 Counsel Appointed

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

SUSAN MENZER
Assistant United States Attorney
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601

by electronically filing the foregoing with the Clerk of Court on July 30, 2020, using the CM/ECF system which will send notification of such filing to the above.

This the 30th day of July, 2020.

***/s/ Cindy Johnson***
CINDY JOHNSON
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Cindy_Johnson@fd.org
N.C. State Bar No. 41788
LR 57.1 Counsel Appointed