UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CR-00261-FL

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | GOVERNMENT'S SENTENCING |
| v. ) | MEMORANDUM AND OPPOSITION |
| ) | TO DEFENDANT'S MOTION FOR |
| JAMAL MONTA WATSON ) | A VARIANCE |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, respectfully files this memorandum to address the sentencing of Defendant Jamal Monta Watson and to oppose his request for a downward variance. The Government recommends that the Court sentence the Defendant to a period of incarceration within the applicable United States Sentencing Guideline range, order him to pay $78,331.22 in restitution, as calculated by the United States Probation Office, and forfeit $29,732.36. For the reasons stated below, this sentence is sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. Section 3553(a), in that it will reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, deter future crime, and protect the public from further crimes of the Defendant.

I. **The Offense Conduct**

The Presentence Investigation Report ("PSR") accurately sets forth a detailed summary of Defendant's conduct. (D.E. 17 at ¶¶ 6-20). On August 24, 2017, the Defendant began a three-year period of supervised release after serving 121-months in federal custody for Distribution of a Quantity of Heroin and Aiding and Abetting,

in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and Possession of a Firearm by a Felon, in violation of 18 U.S.C. § 922(g)(1). See 5:08-CR-282-4F at D.E. 376 and D.E. 912.[1] Five weeks later, on November 3, 2017, the Defendant fraudulently obtained a $16,900 loan from State Employees' Credit Union (SECU) to purchase a 2008 Mercedes S Class by falsely representing his employment and earnings. D.E. 17 at ¶ 7. A few weeks later, on November 27, 2017, the Defendant attempted to obtain $45,787.50 from Ally Financial to purchase a 2012 Porsche Panamera by falsely representing steady employment and higher monthly earnings. After Ally Financial denied his application, the Defendant returned to SECU and fraudulently obtained $9,843.65 funds to purchase a 2007 Audi by similarly misrepresenting his employment and earnings. Id. at ¶ ¶ 7-8. The Defendant defaulted on both auto loans. SECU repossessed the vehicles and sold them at auction, resulting in an actual loss of $20,581.46.[2]

In May 2018, the Defendant began applying for more vehicle loans. Unable to qualify using his own social security number (SSN), the Defendant provided another individual's SSN in addition to false employment information. Although his first attempt to obtain financing from Ally to purchase a 2013 Audi was unsuccessful, Ally approved a $29,732 loan on May 31, 2018 to purchase a 2014 Maserati Ghibli after

---

[1] The Honorable James C. Fox originally sentenced the Defendant to 180 months' imprisonment. On April 11, 2011, after the Government filed a Rule 35 motion, his sentence was reduced to 135 months. On January 27, 2015, pursuant to 18 U.S.C. § 3582(c)(2), his sentence was reduced again to 131 months. See 5:08-CR-282-4F at D.E. 912.

[2] In addition to these two vehicle loans, on November 13, 2017, Watson obtained a consumer loan from SECU for $2,000. SECU relied upon the same false employment information when it approved the loan. The Defendant also defaulted on this loan, increasing SECU's total loss to $22,025.31.

2

the Defendant tendered $9,800 in U.S. currency to the dealership and provided fictitious employment information. Id. at ¶ ¶ 9-10. The Defendant also defaulted on this loan. This vehicle was never located, resulting in a total loss to Ally.

Between June 16, 2018 and November 6, 2018, the Defendant attempted to obtain approximately $262,286 in loans to purchase luxury vehicles from dealers in various North Carolina locations, including Capital Ford and Sir Walter Chevrolet, in Raleigh. Id. at ¶¶ 11 and 16. The Defendant continued to use a SSN issued by the Social Security Administration to another individual and provided false monthly earnings ranging between $4,300 and $8,000. He also, on November 3, 2018 and November 6, 2018, used a fake North Carolina driver's license with a Durham, North Carolina address in an obvious effort to frustrate repossession efforts once he defaulted on these loans. Id. at ¶ 16 and n.3.

During this time, the Defendant also aided and abetted his wife in committing bank fraud in the exact manner: providing a false SSN and fictitious earnings. Id. at ¶¶ 12-15, 18 and 19. Between July 3, 2018 and November 19, 2018, she obtained or attempted to obtain at least $150,249. Id. She used the same employer information, Hanna's Trucking, that the Defendant used on his 2018 loan applications. Id. at ¶¶ 9-14, 17-19. The North Carolina Division of Employment Security had no record of such earnings for either the Defendant or his wife. Id. at ¶ 19. On November 26, 2018, the Defendant was involved in an accident driving the 2018 Sonata that his wife had fraudulently obtained from Lake Norman Hyundai.

3

Id. The vehicle was badly damaged and not properly insured, resulting in $26,573.55 loss to the dealership. Id. at ¶¶ 20 and 24.[3]

## II.   **The Plea Agreement and the Appropriate Guidelines Calculation**

On June 24, 2019, pursuant to a written plea agreement, the Defendant waived Indictment and pled guilty to a single count Criminal Information filed in the Western District of North Carolina, charging him with Bank Fraud and Aiding and Abetting, in violation of 18 U.S.C. Sections 1344 and 2.[4]  The Defendant agreed

> [t]o make restitution to all victims directly or indirectly harmed by the Defendant's "relevant conduct," as defined by U.S.S.G. §1B1.3, including conduct pertaining to any uncharged conduct, regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A.

D.E. 6 at ¶2b.  He further agreed to forfeit the proceeds he obtained, namely a 2014 Maserati and the $29,732.36 that he used to obtain this vehicle. Id. at ¶2e.  With respect to the United States Sentencing Guidelines (U.S.S.G.), the parties stipulated his criminal conduct involved the possession and use of an authentication feature to warrant a two-level upward adjustment pursuant to Section 2B1.1(b)(11)(A)(ii) and the Defendant was entitled to a three-point downward adjustment for acceptance of responsibility pursuant to Section 3E1.1(a). Id. at ¶¶5b and 5c.

---

[3] After the dealership received loan approval notification, but before transfer of the funds, the dealership allowed the Defendant's wife to take possession of the vehicle.  The lender subsequently rejected the application. D.E. 17 at ¶ 19.

[4] The Defendant consented to a transfer in jurisdiction to the Eastern District of North Carolina in accordance with Rule 20 of the Criminal Rules of Procedure. (D.E. 1).

A. Offense Conduct

Under the applicable Guideline for bank fraud, the offense level calculation begins with the amount of loss, which "is the greater of actual or intended loss." U.S.S.G. § 2B1.1, comment. (3(A)). The parties did not stipulate to an intended loss. In this case, there were many failed attempts by the Defendant and his wife to defraud financial institutions. As such, the intended loss was higher than the actual loss. After reviewing the records provided by the financial institutions, Probation determined that the intended loss attributable to the Defendant was $539,888.67, which corresponds to a 12-level increase. D.E. 17 at ¶¶ 20, 75 (*citing* U.S.S.G. § 2B1.1(b)(1)(G). Without any legal support, the Defendant claimed the $123,671 associated with the Defendant's wife should not be included. D.E. 17 Addendum at ¶ 1. Probation responded by citing the relevant conduct provision, which provides the Defendant is responsible for acts that "were part of the same course of conduct or common scheme or plan as the offense of conviction." Id. (*citing* U.S.S.G. §§ 1B1.3(a)(2) and 3D1.2(d)). Application note 5 explains:

> For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.

U.S.S.G. §1B1.3, comment. (n.5(B)(i)). Probation noted that the similar manner in which the Defendant and his wife committed the fraud (false SSN and same fictitious employer) showed they were acting in concert sufficient to include the loans she fraudulently obtained or attempted to fraudulently obtain in the total intended loss

5

amount. Id.⁵ Probation also highlighted the fact the Defendant was driving one of the vehicles she fraudulently obtained in Durham when he was involved in an accident.

The Defendant also objected to the intended loss figure of $539,888.67 by simply asserting: "it is 8.5 times greater than the actual loss and is a gross overstatement of the seriousness of the offense." Id. at ¶2.⁶ Regardless of the Defendant's belief, Probation's conclusion is legally sound. Application Note 3(ii) of the Commentary to U.S.S.G. Section 2B1.1 provides that

> 'intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.,* as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

Accordingly, it is irrelevant if the fraud was unsuccessful. Fraudulent attempts are part of the common scheme and can be included in relevant conduct for intended loss purposes.⁷

The parties agreed to a two-level upward adjustment for possession or use of an authentication feature, namely other individuals' SSNs, increasing his adjusted offense level to 21. D.E. 17 at ¶¶ 76 (*citing* U.S.S.G. § 2B1.1(b)(11)(A)(ii)) and 80.

---

⁵ Even if the Court subtracts the $123,671 from $539,888.67, the guidelines would not change. $416,217.67 is greater than $250,000. See U.S.S.G. § 2B1.1(b)(1)(G)(add 12 levels added for loss more than $250,000).

⁶ The actual loss is $78,331.22, which is the same as the amount of restitution. If this amount multiplied by 8.5 the total is $665,815.37, not $539,888.67.

⁷ It appears Probation mistakenly referred to $441,567.67 as the total loss, rather than $539,888.67. Either amount is greater than $250,000 to justify the 12 level increase, under U.S.S.G. § 2B1.1(b)(1)(G).

6

With a three-level reduction for acceptance of responsibility, the Defendant's total offense level is 18. Id. at ¶¶82-84.

    B.    <u>Criminal History</u>

The Defendant's criminal history began at age 17 with an involuntary manslaughter conviction for shooting into a Durham residence and killing one of the six occupants. Id. at ¶¶27 and 28. This and six other convictions that occurred before the Defendant's 23rd birthday were too old to consider in computing the Defendant's criminal history. Id. at ¶¶27-30, 32-33 (*citing* U.S.S.G. §§ 4A1.2(e)(2) and (3)). Probation correctly computed his subsequent convictions resulted in a subtotal criminal history score of 9. Id. at ¶¶ 32, 35, 40, and 42. Since the Defendant was under supervision at the time he committed the offense, Probation correctly added two points for a total criminal history score of 11. Id. at ¶¶ 43-44 (<u>citing</u> U.S.S.G. § 4A1.1(d)). This corresponds to a criminal history category V. Id. at ¶ 45.

Based upon a total offense level of 18 and a criminal history category of V, the Defendant's guideline imprisonment range is 51 to 63 months. Id. at ¶ 86.

III.    **The § 3553(a) Factors, Applied and the Appropriate Sentence**

Following <u>United States v. Booker</u>, 543 U.S. 220 (2005), a framework has developed by which a court determines the appropriate sentence. First, the sentencing court must properly calculate the advisory range of imprisonment under the Sentencing Guidelines. <u>Gall v. United States</u>, 552 U.S. 38, 49-50 (2007). After calculating the range, the district court must "giv[e] both parties an opportunity to argue for whatever sentence they deem appropriate" and "then consider all of the §

7

3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49-50.

The factors to consider are listed in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; the need for the sentence to promote respect for the law; the need for the sentence to provide just punishment for the offense; the need for the sentence to afford adequate deterrence to criminal conduct; the need for the sentence to protect the public from further crimes of the defendant; the need to provide the defendant with needed training, care, or treatment; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

A.     The Nature and Circumstances of the Offense

The Defendant criminal conduct was serious, repetitive and continued for more than a year. If not for his federal probation officer, it is more than likely that the Defendant would have continued in his illegal activity.[8] In addition to falsifying employment information, fabricating pay stubs and using other individuals' SSNs, the Defendant took steps to prevent the financial institutions from locating and repossessing the vehicles by providing a fake driver's license bearing a false address. Further, he included his wife in at least one other individual in his systematic pattern

---

[8] The Defendant supervising Probation Officer learned of the fraudulent activity after the Defendant's accident in the Hyundai

8

of fraudulent conduct. The actual losses to the financial institutions and the Lake Norman Hyundai dealership by the Defendant were also significant.

    B.    <u>The History and Characteristics of the Defendant</u>

Nothing in the Defendant's history mitigates his culpability in this case. To the contrary, his extensive criminal history demonstrates the need for a lengthy period of incarceration. For the most part, the Defendant has spent his adult years incarcerated. D.E. 17 at ¶¶ 59. As detailed below, the Defendant was not a model inmate and upon release into the community, the Defendant repeatedly failed to comply with conditions of supervision and reoffended.

During his first period of incarceration, the Defendant incurred nine disciplinary infractions for, among other things, provoking assaults, fighting, interfering with staff, and disobeying orders. D.E. 17 at ¶ 28. Within two month of his May 1, 1998 release from discharging a weapon into an occupied dwelling (<u>Id.</u> at ¶ 28) and while on probation for involuntary manslaughter (<u>Id.</u> at ¶ 27), the Defendant was arrested and ultimately convicted of two instances of possessing a stolen motorcycle, resisting a public officer and no operator's license, reckless driving. <u>Id.</u> at ¶¶ 29 and 30. On the same day he plead guilty to those charges, the Defendant's probation was revoked for absconding, failing to report to his probation officer, violating curfew, and failing to complete community service. <u>Id.</u> at ¶ 27. He returned to state custody to serve several sentences. <u>Id.</u> at ¶¶ 27, 29-31.

Two months after his release, on February 28, 2000, the Defendant "forcibly stole $600 from another individual with a handgun." <u>Id.</u> at ¶34. On June 18, 2000,

the Defendant kidnapped a man "for the purpose of committing robbery with a dangerous weapon." Id. at ¶ 32. On June 27, 2000, he assaulted a female. Id. at ¶ 33. He ultimately plead guilty to kidnapping, two counts of possession of a firearm by a felon and assault of a female and served several custodial terms. Id. at ¶¶ 32-34. On December 30, 2004, the state placed the Defendant on post-release supervision. Id. For unknown reasons, the state court revoked his post-release supervision on July 2, 2006. Id. at ¶ 32.

Between December 21, 2006 and July 27, 2007, the Defendant went on another crime spree. Durham County charged him in five different matters. Id. ¶¶ 35-39. For the most serious charges of felon in possession and habitual felon, the Defendant plead guilty and was sentenced to 80 to 105 months' custody. Id. at ¶¶ 35 and 38. On September 29, 2008, the Defendant also plead guilty to federal charges of distributing a quantity of heroin (1.937 kilograms) and possession of a firearm by a felon. Id. at ¶ 40. While in federal custody, the Defendant incurred two disciplinary infractions for assault and possessing an unauthorized item. Id. On August 24, 2017, the Defendant simultaneously completed his state and federal terms of imprisonment. Id. at ¶¶ 35, 38 and 40. Just a few month later, the Defendant began the instant scheme to defraud multiple financial institutions. On June 24, 2019, this Court revoked his supervised released based upon the new criminal conduct and other violations and sentenced him to a 24-month term of custody. Id. at ¶ 40.

Since he has spent most of his adult life in prison, the Defendant has virtually no employment history. Id. at ¶¶ 57, 59, 64, 66, and 68. By his own admission, the

Defendant has five children with five different women and is under no legal obligation to provide financial support. Id. at ¶ 52.

    C.    <u>Reflecting the Seriousness of the Offense, Promoting Respect for the Law, and Providing Just Punishment for the Offense</u>

The Government respectfully suggests a sentence within the guideline range will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offenses. The Defendant's criminal history and poor adjustment to supervision demonstrates his lack of respect for the law and rejection of rehabilitation. As such, there is a great need for punishment and a sentence within the guideline range would provide just punishment given the crime committed.

    D.    <u>Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes of the Defendant</u>

Courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." <u>United States v. Hauptman</u>, 111 F.3d 48, 52 (7th Cir. 1997). Similarly, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." <u>Id.</u>

In this case, there is a significant need for individual deterrence. Defendant committed heinous crimes and received lengthy sentences of incarceration. Yet, he continued to reoffend. This is his first conviction for a fraud scheme. A below the

guideline sentence could easily send him the wrong message: committing fraud results in higher financial rewards with minimal exposure to incarceration if caught.

E. <u>The Defendant's Motion for a Downward Variance</u>

None of the factors in Section 3553(a) warrant imposing anything other than a guidelines sentence, and therefore, the Court should swiftly deny Defendant's plea for a downward variance based on 3553(a) factors and a shorter period of supervised release. The Defendant has shown his inability to live in the community without engaging in criminal activity. The need for post-release supervision is great. The Court should impose a five-year term of supervised release.

Furthermore, the Court should deny the Defendant's request for a recommendation to home confinement based upon the CARES Act. D.E. 23 at 6. As the Defendant recognized, the Court lacks authority to direct the Bureau of Prison (BOP) to release him for compassionate reasons. Additionally, neither the Defendant nor the Court can anticipate whether the Coronavirus will pose a health risk to the Defendant in the future. There are conflicting reports every day. The Defendant, like all federal inmates, should follow the proper BOP administrative procedures.

IV. **Restitution and Forfeiture**

Probation correctly set forth the correct amount of restitution. D.E. at ¶96. Even though the Defendant agreed to a broad restitution order, including any loss resulting from relevant conduct, as defined as defined by U.S.S.G. §1B1.3, he has objected to the inclusion of $26,573.55 loss to Lake Norman Hyundai in the restitution order. D.E. 23, Addendum at ¶3. As discussed above, relevant conduct

includes loans fraudulently obtained in his wife's name since they were part of a common scheme. Therefore, his objection should be overruled.

Finally, the Defendant agreed to forfeit $29,732.36, which represents the proceeds he fraudulently obtained to purchase the 2014 Maserati, and the actual vehicle. Prior to the sentencing hearing, the Government will file a Motion for Forfeiture and Proposed Order.

WHEREFORE, the Government requests the Court sentence the Defendant to a period of incarceration within the applicable guideline range followed by five years' supervised release, order him to pay $78,331.22 in restitution and forfeit $29,732.36.

Respectfully submitted this 4th day of August 2020.

ROBERT J. HIGDON, JR.
United States Attorney

By: /s/ Susan B. Menzer
SUSAN B. MENZER
Assistant United States Attorney
Criminal Division
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461
Telephone: (919) 856-4099
E-mail: susan.menzer@usdoj.gov
D.C. Bar #421007

**CERTIFICATE OF SERVICE**

This is to certify that I have this 4th day of August 2020, served a copy of the foregoing upon Defendant's counsel electronically via the CM/ECF system.

                                  ROBERT J. HIGDON, JR.
                                  United States Attorney

                By:    /s/ Susan B. Menzer
                          SUSAN B. MENZER
                          Assistant United States Attorney
                          Criminal Division
                          310 New Bern Avenue, Suite 800
                          Raleigh, NC 27601-1461
                          Telephone: (919) 856-4099
                          E-mail: susan.menzer@usdoj.gov
                          D.C. Bar #421007